## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

RYAN PLUMBING, INC. and AIRIC'S
HEATING & AIR CONDITIONING, INC.,
individually and on behalf of all others similarly
situated,

No.

                                    Plaintiffs,

**CLASS ACTION COMPLAINT**

        v.

**JURY TRIAL DEMANDED**

VIEGA LLC,

                                    Defendant.

536886.4

# TABLE OF CONTENTS

I.    NATURE OF ACTION ................................................................................................. 1

II.   THE PARTIES ............................................................................................................. 3

III.  JURISDICTION AND VENUE .................................................................................. 4

IV.   BACKGROUND .......................................................................................................... 5

    A.   Copper Press Fittings .......................................................................................... 5

    B.   Carbon Steel Press Fittings ................................................................................. 7

    C.   Product Distribution ............................................................................................ 8

V.    TRADE AND COMMERCE ....................................................................................... 9

VI.   RELEVANT MARKET ............................................................................................. 10

    A.   Relevant Product Markets ................................................................................. 10

    B.   Relevant Geographic Markets .......................................................................... 10

    C.   Barriers to Entry ............................................................................................... 11

VII.  VIEGA'S MARKET POWER ................................................................................... 11

VIII. Viega's Anticompetitive Conduct ............................................................................ 12

    B.   Weinstein Supply Company: ............................................................................ 13

    C.   Moore Supply Company: .................................................................................. 14

    D.   Mid-City Supply Co., Inc.: ............................................................................... 15

    E.   American Pipe & Supply Company: .................................................................. 15

    F.   Charles D. Sheehy, Inc.: ................................................................................... 15

    G.   Peabody Supply Company: ............................................................................... 16

    H.   Western Nevada Supply: ................................................................................... 16

IX.   INJURY TO COMPETITION .................................................................................. 17

X.    FEDERAL INJUNCTIVE CLASS ........................................................................... 17

    A.   Rule 23(a) Prerequisites ................................................................................... 18

B.    Rule 23(b)(2) Prerequisites ............................................................. 19

XI.   STATE DAMAGES CLASSES .................................................................. 19

A.    Rule 23(a) Prerequisites ................................................................... 19

B.    Rule 23(b)(3) Prerequisites ............................................................. 20

FEDERAL INJUNCTIVE CLAIMS ..................................................................... 20

FIRST CLAIM FOR RELIEF (TYING - SHERMAN ACT § 1 AND CLAYTON ACT § 3).... 21

SECOND CLAIM FOR RELIEF (RESTRAINT OF TRADE - SHERMAN ACT § 1) ............. 23

THIRD CLAIM FOR RELIEF (MONOPOLIZATION - SHERMAN ACT § 2)........................ 24

STATE DAMAGES CLAIMS ............................................................................ 25

FOURTH CLAIM FOR RELIEF (ALABAMA CODE §§ 6-5-60 ET SEQ.) (ON BEHALF OF THE ALABAMA CLASS)............................................................................... 25

FIFTH CLAIM FOR RELIEF (ARIZONA REV. STAT. §§ 44-1401 ET SEQ.) (ON BEHALF OF THE ARIZONA CLASS)............................................................................. 26

SIXTH CLAIM FOR RELIEF (CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 16720, 16750) (ON BEHALF OF THE CALIFORNIA CLASS)............................................... 27

SEVENTH CLAIM FOR RELIEF (DISTRICT OF COLUMBIA CODE ANN. §§ 28-4501 ET SEQ.) (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)...................................... 28

EIGHTH CLAIM FOR RELIEF (IOWA CODE §§ 553.1 ET SEQ.) (ON BEHALF OF THE IOWA CLASS)............................................................................................ 29

NINTH CLAIM FOR RELIEF (KANSAS STAT. ANN §§ 50-101 ET SEQ.) (ON BEHALF OF THE KANSAS CLASS).............................................................................. 30

TENTH CLAIM FOR RELIEF (MICHIGAN COMPILED LAWS ANN. §§ 445.771 ET SEQ.) (ON BEHALF OF THE MICHIGAN CLASS)................................................................ 31

ELEVENTH CLAIM FOR RELIEF (MINNESOTA ANN. STAT. §§ 325D.49 ET SEQ.) (ON BEHALF OF THE MINNESOTA CLASS)................................................................. 32

TWELFTH CLAIM FOR RELIEF (MISSISSIPPI CODE ANN. §§ 75-21-1 ET SEQ.) (ON BEHALF OF THE MISSISSIPPI CLASS) ................................................................ 34

THIRTEENTH CLAIM FOR RELIEF (NEBRASKA REV. STAT. §§ 59-801 ET SEQ.) (ON BEHALF OF THE NEBRASKA CLASS)................................................................... 35

FOURTEENTH CLAIM FOR RELIEF  (NEVADA REV. STAT. ANN. §§ 598A.010 ET SEQ.) (ON BEHALF OF THE NEVADA CLASS) .............................................................................. 36

FIFTEENTH CLAIM FOR RELIEF  (NEW HAMPSHIRE REV. STAT. §§ 356:1 ET SEQ.) (ON BEHALF OF THE NEW HAMPSHIRE CLASS) ................................................................. 37

SIXTEENTH CLAIM FOR RELIEF (NEW MEXICO STAT. ANN. §§ 57-1-1 ET SEQ.)  (ON BEHALF OF THE NEW MEXICO CLASS) .............................................................................. 38

SEVENTEENTH CLAIM FOR RELIEF (THE DONNELLY ACT, NEW YORK GENERAL BUS. LAW §§ 340 ET SEQ.)  (ON BEHALF OF THE NEW YORK CLASS) ......................... 39

EIGHTEENTH CLAIM FOR RELIEF  (NORTH CAROLINA GENERAL STAT. §§ 75-1 ET SEQ.)  (ON BEHALF OF THE NORTH CAROLINA CLASS) .................................................. 40

NINETEENTH CLAIM FOR RELIEF  (NORTH DAKOTA CENTURY CODE §§ 51-08.1-01 ET SEQ.)  (ON BEHALF OF THE NORTH DAKOTA CLASS) ................................................. 42

TWENTIETH CLAIM FOR RELIEF (OREGON REVISED STATUTES §§ 646.705 ET SEQ.) (ON BEHALF OF THE OREGON CLASS) .................................................................................. 43

TWENTY-FIRST CLAIM FOR RELIEF (RHODE ISLAND ANTITRUST ACT, RHODE ISLAND GEN. LAW §§ 6-36-1 ET SEQ.)  (ON BEHALF OF THE RHODE ISLAND CLASS) 44

TWENTY-SECOND CLAIM FOR RELIEF (SOUTH DAKOTA CODIFIED LAWS §§ 37-1-3.1 ET SEQ.)  (ON BEHALF OF THE SOUTH DAKOTA CLASS) ......................................... 45

TWENTY-THIRD CLAIM FOR RELIEF  (TENNESSEE CODE ANN. §§ 47-25-101 ET SEQ.) (ON BEHALF OF THE TENNESSEE CLASS) ........................................................................... 46

TWENTY-FOURTH CLAIM FOR RELIEF  (UTAH CODE ANN. §§ 76-10-3101 ET SEQ.) (ON BEHALF OF THE UTAH CLASS) ...................................................................................... 47

TWENTY-FIFTH CLAIM FOR RELIEF (VERMONT STAT. ANN. §§ 2453 ET SEQ.)  (ON BEHALF OF THE VERMONT CLASS) ..................................................................................... 48

TWENTY-SIXTH CLAIM FOR RELIEF  (WEST VIRGINIA CODE §§ 47-18-1 ET SEQ.) (ON BEHALF OF THE WEST VIRGINIA CLASS) ................................................................. 49

TWENTY-SEVENTH CLAIM FOR RELIEF  (WISCONSIN STAT. §§ 133.01 ET SEQ.)  (ON BEHALF OF THE WISCONSIN CLASS) ................................................................................. 50

PRAYER FOR RELIEF ..................................................................................................... 51

JURY TRIAL DEMANDED .............................................................................................. 52

Plaintiffs Ryan Plumbing, Inc. ("Ryan Plumbing") and Airic's Heating & Air Conditioning, Inc. ("Airic's Heating") (collectively "Plaintiffs"), bring this action for injunctive relief under Sherman Act Sections One and Two (15 U.S.C. §§ 1, 2) and Clayton Act Section Sixteen (15 U.S.C. § 26), as well as for damages pursuant to state antitrust law allowing indirect-purchaser remedy under this Court's supplemental jurisdiction, against Viega LLC ("Viega" or "Defendant").

## I.  NATURE OF ACTION

1.  This is an antitrust action directed at Viega's anticompetitive conduct in the markets for copper press fittings and carbon steel press fittings.

2.  Viega is a privately-owned company that manufactures, imports and sells fittings in the United States.

3.  Fittings are essential components of pipeline systems that are used to join pipes or tubes.  Fittings can join pipes in straight lines or change, divide, or otherwise direct the flow of media, including potable water, process water, oil, gases, and fuel.  Fittings are produced in geometrical configurations of varying sizes and surface coatings.

4.  Pipeline systems, including fittings, can be made from different raw materials, such as copper, bronze, carbon steel, stainless steel, and thermoplastics.  The plumbing industry differentiates between these pipeline systems because each one has optimal benefits suited to different application.

5.  Press technology refers to the use of hydraulic power tools and jaws to press or crimp a joint to create a permanent seal between the fitting and the pipe. Press technology provides a faster, safer, and more reliable method of joining fittings and pipe without compromising the quality of installation.

6.      Viega has possessed for several years and continues to possess monopoly power in the market for carbon steel press fittings, which are press fittings used for black iron pipe, which is used to transport fuel oil and natural gas.  Viega's carbon steel press fittings were the first to market and, until July 2017, the only carbon steel press fittings approved in the United States.  Viega controls at least 95% of the carbon steel press fittings market.

7.      Viega also holds a well-established, dominant position in the market for copper press fittings, which are press fittings used for copper pipe. It controls approximately 71% of the U.S. market.

8.      NIBCO, Inc. ("NIBCO") is Viega's most significant competitor in the copper press fittings market. It has also brought an action for lost-profit claims in the U.S. District Court for the Middle District of Pennsylvania before Chief Judge Christopher C. Conner in *Nibco Inc. v. Viega LLC*, No. 17-1739 (Sept. 26, 2017). On average, NIBCO's prices for copper fittings are lower than Viega's prices for copper press fittings – sometimes as much as 15% lower. NIBCO does not manufacture carbon steel press fittings.

9.      Fittings manufacturers such as NIBCO and Viega sell almost entirely through wholesale distributors. The wholesale distributors in turn sell fittings to contractors, developers, and other end users.

10.      To enhance and maintain its dominant position in the copper press fittings market, Viega has engaged in systematic anticompetitive and exclusionary conduct to undermine NIBCO and other Viega competitors' attempts to compete in the relevant market and maintain and expand their customer bases.

11.      Specifically, Viega has used its market power in the carbon steel press fittings market to coerce wholesale distributors not to buy copper press fittings from NIBCO and other

Viega competitors. Viega refuses to sell its carbon steel press fittings unless a wholesale distributor also purchases Viega's copper press fittings and agrees not to purchase copper press fittings from NIBCO and other Viega competitors.

12. Viega also coerces wholesale distributors not to purchase copper press fittings from NIBCO and other Viega competitors by withholding discounts, rebates, and other pricing concessions for its carbon steel press fittings. Thus, distributors who sell both carbon steel press fittings and copper press fittings find that Viega's pricing penalties mean their only viable economic option is to purchase both kinds of press fittings from Viega.

13. Viega's conduct has denied NIBCO and other competitors free access to the relevant market for copper press fittings and has significantly prejudiced competition in the relevant market, not because Viega has a better product or a lower price, but because of its power in the market for carbon steel press fittings. As a consequence, wholesale distributors and end users are forced to pay higher prices.

14. Viega's anticompetitive conduct has been, and continues to be, effective in maintaining and stabilizing prices for both wholesalers and end users at artificially inflated levels, eliminating and excluding any concrete or potential competition, extending or maintaining its market power, and fortifying technological barriers to entry in the copper press fittings market.

## II.   THE PARTIES

15. Plaintiff Ryan Plumbing, Inc. is a Wisconsin business located in Eau Claire, Wisconsin. Plaintiff has made purchases of Viega copper press fittings from one or more Viega wholesale distributors in the last four years.

16.     Plaintiff Airic's Heating & Air Conditioning, Inc. is a Minnesota business located in Savage, Minnesota. Plaintiff has made purchases of Viega copper press fittings from one or more Viega wholesale distributors in the last four years.

17.     Defendant Viega manufactures and distributes plumbing, heating, and pipe joining systems for industrial, commercial, and residential projects. Viega is a limited liability company organized under the laws of the State of Delaware with its U.S. headquarters located at 12303 Airport Way, Suite 395, Broomfield, Colorado 80021. Viega has its Northeast Distribution Center in Harrisburg, Pennsylvania.    Viega acts as an agent for its parent corporation Viega GmbH & Co. KG, which is located in Atterndorn, Germany, by distributing Viega copper press fittings and carbon steel press fittings in the United States, including Minnesota and Wisconsin and those products purchased by Plaintiffs.

## III.    JURISDICTION AND VENUE

18.     Plaintiffs bring this lawsuit for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. § 1337(a).

19.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the causes of action asserted in this complaint arise under the laws of the United States. This Court has supplemental jurisdiction over the causes of action asserted under state law pursuant to 28 U.S.C. § 1367 because the state law causes of action are so related to the causes of action within the Court's federal question jurisdiction that the state law causes of action form part of the same case or controversy.

20.     Defendant is subject to personal jurisdiction in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because it transacts business in this District.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)-(d) and 15 U.S.C. §§ 15 and 22 because Defendant is doing business in, has and had agents in, and is found

to transact business in this District, including operating its Northeast Distribution Center in Harrisburg, PA.

## IV.    BACKGROUND

### A.    Copper Press Fittings

22.    Copper pipe is contractors' leading choice for plumbing, heating, and cooling applications.  Copper pipe can be used for potable water service and distribution, industrial process water, air conditioning and refrigeration field service, compressed medical air, medical gas, drain/waste/vent applications, and HVAC applications. The type of copper pipe to be used in a particular application is governed by plumbing and mechanical codes.

23.    Press technology refers to the use of hydraulic power tools and jaws to press or crimp a joint to create a permanent seal between the fitting and pipe. The joints rely on the sealing capability of a special fitting that contains an elastomeric gasket or seal (such as EPDM). Press technology takes advantage of copper's excellent malleability and its increase in strength when cold worked.

24.    An advantage of using copper press fittings is that plumbers are able to complete projects with less time, budget and manpower than they can with traditional methods. All that is required to install a copper press fitting is removing burrs from the outer and inner diameter of the pipe, sliding the fitting onto the pipe to minimum insertion depth, and pulling the trigger on a power tool. Installation can be completed in three to 30 seconds depending on the joint size. Moreover, the tools are lightweight, battery powered, and easy to handle, which allows installers to remain mobile.

25.    Copper press fittings are also advantageous because they can be installed flame-free. This eliminates flames, solder, flux, gas tanks, fumes, and noxious gases, as well as the

need for a hot work permit, fire watch, and fire extinguishers. As a result, the job site is safer because piping systems can be installed in occupied spaces with no risk of a fire hazard.

26.    Three manufacturers account for over 90% of the copper press fittings sold in the United States: Viega, NIBCO, and Elkhart Products Corporation ("EPC").

27.    Viega introduced its copper press fittings to North America in 1999. They are sold under the brand name ProPress® and are available in multiple configurations from $^1/_2$" to 4" diameter.

28.    According to its marketing materials, Viega's copper press fittings are manufactured with the patented Viega Smart Connect® feature, which helps to identify connections that need to be pressed by allowing an unpressed fitting to leak during pressure testing.

29.    Viega has held and continues to hold the highest market share of copper press fittings sold in the United States. In 2016, Viega's net sales of copper press fittings were approximately $115,000,000, which is approximately 71% of the U.S. copper press fittings market.

30.    NIBCO, Viega's most significant competitor in the market for copper press fittings, had approximately 17% of the U.S. copper press fittings market, by net sales.

31.    On average, NIBCO's prices for copper press fittings are lower than Viega's prices for copper press fittings – sometimes as much as 15% lower.

32.    EPC introduced its copper press fittings in 2011. They are sold under the brand name APOLLOPRESS® and are available in multiple configurations from $^1/_2$" to 4" diameter. According to its marketing materials, EPC's copper press fittings feature pre-lubricated seals and "Leak Before Press" technology.

33.    In 2016, EPC had approximately 5% of the U.S. copper press fittings market, by net sales.

B.    **Carbon Steel Press Fittings**

34.    Black iron pipe is a form of steel pipe that is less expensive and more malleable than other iron or steel pipes.  It has a black oxide scale on its surface, providing its name.

35.    Due to its strength, black iron pipe is ideal for transporting gas or propane in rural and urban areas, and for delivering high pressure steam and air. The oil and petroleum industries use black iron pipe for moving large quantities of oil through remote areas. Other uses for black iron pipe include gas distribution inside and outside homes, water wells, sewage systems, and fire protection systems.

36.    Carbon steel press fittings, the press fittings for black iron pipe, rely on hydraulic power tools and jaws to press or crimp a joint to create a permanent seal between the fitting and pipe. The joints rely on the sealing capability of a special fitting that contains a sealing element.

37.    Viega represents in its marketing materials that carbon steel press fittings allow plumbers to complete projects with less time, budget, and manpower. Viega also represents that carbon steel press fittings offer the advantage of flame-free installations, which eliminates the risk of a fire hazard.

38.    Viega was the first manufacturer to market a carbon steel, cold mechanical press system approved in the United States.  Its carbon steel press fittings are sold under the brand names MegaPress® and MegaPressG®, and are available in configurations from $^1/_2$” to 2” diameter. Viega’s marketing material indicates that its carbon steel press fittings are designed exclusively for connection to and installation of black iron piping.

39.    According to Viega’s marketing materials, the MegaPress® is approved for use in hydronic heating, compressed air, fire sprinkler, and cooling water applications. Its carbon steel

press fittings have Viega's patented Viega Smart Connect® feature. They also include an EPDM sealing element which is approved for use in heating, cooling, and industrial systems ranging from fire protection and compressed air to chilled water.

40.    According to Viega's marketing material, the MegaPress G® is approved for use in fuel oil and fuel gas installations. Its carbon steel press fittings have Viega's patented Viega Smart Connect® feature. They also include an HNBR sealing element which is approved for use in fuel, oil, lubricants and gasses ranging from diesel fuel and propane to natural gas.

41.    Viega's MegaPress® and MegaPress G® were the only carbon steel press fittings approved in the United States until July 2017. As a result, Viega controls at least 95% of the carbon steel press fittings market.

### C.    Product Distribution

42.    Demand for copper press fittings and carbon steel press fittings typically begins with an end user creating a project design that includes specifications for piping and other components to be used in the project.  Engineers are usually responsible for drafting fittings specifications, which are often mandated by municipal code or by state or federal law.

43.    The project specifications are used to solicit bids from contractors. Once the contractors receive the specifications, they will solicit bids and other assistance from wholesale distributors that can supply various products for that project.

44.    Wholesale distributors employ sales personnel dedicated to servicing the needs of contractors and can generally satisfy the needs of contractors with pre-existing inventory.

45.    Contractors rely on wholesale distributors because: (a) distributors offer a full spectrum of plumbing products; (b) distributors provide a single point of contact for all products; (c) distributors find alternate supply sources when needed; and (d) distributors have relationships with manufacturers and specification knowledge.

46. Contractors typically select wholesale distributors based on price, service, and convenience.

47. The wholesale distributor will supply the contractor either from its inventory or via a direct purchase order from the wholesale distributor to a fittings manufacturer who will deliver the product to the project site.

48. Fittings manufacturers rely on wholesale distributors because: (a) distributors offer better sales coverage than the manufacturer would have with its own sales force alone; (b) distributors have more influence on and more knowledge of projects; (c) distributors free up a manufacturer's working capital by carrying inventory; (d) distributors offer one-stop shopping for the end user or its contractor; (e) distributors aggregate small orders from and shipments to contractors; (f) distributors help manufacturers get their products in specifications; and (e) distributors manage credit requests and absorb the risk of non-payment from contractors.

49. In a free and competitive market, wholesale distributors may carry the product lines of multiple fittings manufacturers, which are selected by wholesale distributors based on customer demand, product quality, price, and historical relationship.

## V.    TRADE AND COMMERCE

50. Viega has sold and continues to sell copper press fittings and carbon steel press fittings in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district. Every year it sells approximately $115 million in copper press fittings in United States interstate commerce.

51. Viega's business activities were intended to and have had a substantial effect on interstate trade and commerce in the United States and have caused antitrust injury in the United States, including in this judicial district. For instance, if not for Viega's anticompetitive conduct, Viega's primary competitor in the relevant market for sale of copper press fittings, NIBCO,

would have had a substantially greater market share in the relevant market for copper press fittings given the range and quality of its products; and Viega's end users would have had improved choice of and more competitive prices for copper press fittings.

## VI.    RELEVANT MARKET

### A.    Relevant Product Markets

52.    There are two relevant product markets in this instance: the market for copper press fittings and the market for carbon steel press fittings.

53.    The markets for copper press fittings and carbon steel press fittings are distinct product markets because they are distinguishable in the eyes of fittings manufacturers, wholesale distributors, and end users for use with specific piping products. Copper press fittings are designed to be used with copper piping and carbon steel press fittings are designed to be used with black iron piping. Furthermore, the demand and pricing for copper press fittings and carbon steel press fittings are distinct. For example, NIBCO does not track the price of carbon steel press fittings when setting the price of its copper press fittings.

54.    Copper press fittings are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product. Copper press fittings are the only type of press fittings that can be used to join copper piping.

55.    Carbon steel press fittings are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product. Carbon steel press fittings are the only type of press fittings that can be used to join black iron piping.

### B.    Relevant Geographic Markets

56.    The United States is the relevant geographic market for both products.

57.    Manufacturers of copper press fittings ship their products nationally from multiple locations to wholesale distributors located across the United States.

58.    Manufacturers of carbon steel press fittings ship their products nationally from multiple locations to wholesale distributors located across the United States.

**C.    Barriers to Entry**

59.    There are significant barriers to entry in both relevant markets that allow Viega to protect and maintain its market power. These include both technological and regulatory barriers. Effective entry into the relevant markets would require developing expertise in design engineering, obtaining certifications and approvals, securing placement on engineers' approval lists, and securing placement in specifications, which are often mandated by municipal code or by state or federal law.

60.    Additionally, the level of capital investment is significant. An entrant would need to build its own foundry or develop a supply chain of foundries to produce fittings, develop or purchase hundreds of patterns of moldings necessary to make a full line of fittings, and establish relationships with end users, contractors, and wholesale distributors based on a reputation for quality and service.

61.    Further, Viega's anticompetitive conduct has heightened these barriers to entry in the relevant market for copper press fittings by creating barriers to entry or expansion by Viega's competitors.

**VII.    VIEGA'S MARKET POWER**

62.    Viega has substantial market power in both relevant markets: carbon steel press fittings and copper press fittings.

63.    Viega has a monopoly in the market for carbon steel press fittings. Its carbon steel press fittings were the first to market and, until July 2017, the only carbon steel press fittings approved in the United States. Viega controls at least 95% of the carbon steel press fittings market.

64.    Viega also possesses substantial market power in the market for copper press fittings. In 2016, it controlled approximately 71% of the copper press fittings market.

## VIII.  VIEGA'S ANTICOMPETITIVE CONDUCT

65.    To maintain its dominant position in the market for copper press fittings, Viega uses its monopoly power in the carbon steel press fittings market to coerce wholesale distributors not to purchase copper press fittings from its competitors.

66.    Among other things, Viega has unlawfully tied the sale of its carbon steel press fittings to the sale of its copper press fittings. Viega has required wholesale distributor customers who want to purchase Viega's carbon steel press fittings to also purchase copper press fittings from Viega and not to purchase or stock copper press fittings from its competitors.

67.    In other instances, Viega has charged a pricing penalty in the form of premium prices or lost multiplier discounts for its carbon steel press fittings if the wholesale distributor customer purchases copper press fittings from a competitor. This pricing penalty forces wholesale distributor customers to purchase Viega's copper press fittings because the combined purchase becomes the only economically viable option available to the customer.

68.    Viega's conduct has denied competitors free access to the market for copper press fittings, not because Viega has a better product or lower price, but because of its power in the market for carbon steel press fittings. Wholesale distributors and end users are forced to forego their free choice, pay higher prices, and pass on the inflated price levels to their customers. Customers – plumbers, contractors, and other end users of copper press fittings – are also denied of freedom of choice.

69.    Viega's anticompetitive conduct directly targets NIBCO, which is Viega's most significant competitor in the market for copper press fittings. When Viega representatives have

threatened customers, they have explicitly stated that the customer must not purchase copper press fittings from NIBCO.

70.    As a result of Viega's anticompetitive conduct, Viega's competitors have lost existing and potential distributors for their copper press fittings, including, but not limited to, R.F. Fager Company, Weinstein Supply Company, Moore Supply Company, Mid-City Supply Co., Inc., American Pipe & Supply Company, Charles D. Sheehy, Inc., Peabody Supply Company, and Western Nevada Supply. In addition, Viega's end users have lost access to copper press fittings manufactured by Viega's competitors and have been forced to pay artificially inflated prices.

### A.    R.F. Fager Company:

71.    R.F. Fager ("Fager") is a wholesale distributor selling in part plumbing, heating, and cooling products from five locations in central Pennsylvania.

72.    Viega has refused to sell to Fager its carbon steel press fittings if Fager continued to sell copper press fittings manufactured by NIBCO.

### B.    Weinstein Supply Company:

73.    Weinstein Supply Company ("Weinstein") is a wholesale distributor selling plumbing, heating and air conditioning products throughout the Northeast of the United States. Weinstein is a division of Hajoca Corporation, which is a wholesale distributor of plumbing, heating, and industrial supplies.

74.    In 2015, Weinstein's branch in Lansdowne, Pennsylvania converted from Viega to NIBCO's copper press fittings. Thereafter, one of Weinstein's customers required carbon steel press fittings for multiple projects. To satisfy the customer's request, Weinstein approached Viega to purchase its carbon steel press fittings. In response, Viega informed Weinstein's

purchasing manager that its carbon steel press fittings were available only if Weinstein switched back to Viega's copper press fittings. Weinstein had no viable choice but to switch back to Viega's copper press fittings and to stop selling NIBCO's copper press fittings.

### C.     Moore Supply Company:

75.     Moore Supply Company ("Moore Supply") is a wholesale distributor of plumbing products, pipe valves, and fittings for residential, commercial, and industrial construction. It has locations throughout Texas. It is a sister company to Hajoca Corporation.

76.     In 2016, several branches of Moore Supply decided to convert to NIBCO copper press fittings. After some branches purchased copper press fittings from NIBCO, Viega threatened to pull its carbon steel press fittings from those branches. As a result, Moore Supply reversed its decision to purchase copper press fittings from NIBCO.

77.     Multiple branch managers informed NIBCO that Moore Supply had no viable choice but to purchase from Viega because of the possibility of losing Viega's carbon steel press fittings.

78.     Another incident involving Moore Supply occurred in the Dallas-Fort Worth area, where two Moore Supply branches purchased carbon steel press fittings and copper press fittings from Viega, and three different branches purchased copper press fittings from NIBCO. The branches supporting NIBCO's copper press fittings would purchase Viega's carbon steel press fittings from its sister branches.

79.     In response, Viega threatened to pull its carbon steel press fittings unless all of the branches (including those already purchasing from NIBCO) also purchased copper press fittings from Viega. As a result, Moore Supply stopped ordering copper press fittings from NIBCO.

### D. **Mid-City Supply Co., Inc.:**

80.    Mid-City Supply Co., Inc. ("Mid-City") is a family- owned wholesale distributor that sells plumbing, HVAC, refrigeration, pipes, valves and fittings ("PVF"), and industrial products. Mid-City's central distribution center is located in Elkhart, Indiana. It also has branch offices in parts of Indiana and Michigan.

81.    Mid-City purchased copper press fittings from NIBCO until 2015. Mid-City converted to Viega's copper press fittings because Viega would not sell its carbon steel press fittings unless Mid-City agreed to drop NIBCO's copper press fittings from its inventory. Although Mid-City wanted to continue purchasing copper press fitting from NIBCO, it switched because of Viega's threat to withhold its carbon steel press fittings.

### E. **American Pipe & Supply Company:**

82.    American Pipe & Supply Company ("American Pipe") is a wholesale distributor located in Birmingham, Alabama. It sells pipe, valves and fittings, plumbing fixtures, and fire sprinkler materials.

83.    In or about 2015, American Pipe stopped purchasing NIBCO's copper press fittings. Customers were asking American Pipe for carbon steel press fittings and Viega required American Pipe to drop NIBCO's copper press fittings and buy only Viega's copper press fittings before it could purchase carbon steel press fittings from Viega.

### F. **Charles D. Sheehy, Inc.:**

84.    Charles D. Sheehy, Inc. ("Sheehy, Inc.") is an independent wholesale distributor located in Avon, Massachusetts. It sells pipe, valves, fittings and mechanical equipment to the mechanical contracting industry of New England.

85.     In or about 2015, Viega shut down one of its plants because of a fire. As a result, Sheehy, Inc. started purchasing copper press fittings from NIBCO. Approximately six months later, one of Sheehy, Inc.'s customers required carbon steel press fittings for a project. As a result, Sheehy, Inc. asked Viega about the availability of its carbon steel press fittings.

86.     In response, Viega told Sheehy, Inc. that it had to drop NIBCO's copper press fittings to purchase Viega's carbon steel press fittings. Although Sheehy, Inc. wanted to continue purchasing NIBCO's copper press fittings, it had no viable choice but to drop NIBCO to access the carbon steel press fittings for its customer.

### G.     Peabody Supply Company:

87.     Peabody Supply Company ("Peabody") is a wholesale distributor of plumbing products, pipe valves, and fittings. It has locations throughout Massachusetts. It is a division of the Hajoca Corporation.

88.     Within the last year, a Viega representative walked into one of Peabody's branch locations and conducted an inventory check. The purpose of the inventory check was to monitor the products being carried by Peabody.

89.     During the encounter, the Viega representative told Peabody personnel that Viega would pull its carbon steel press fittings line from all of Peabody's branches if any of them stocked NIBCO's copper press fittings. As a result, Peabody had no viable choice but to stop purchasing copper press fittings from NIBCO.

### H.     Western Nevada Supply:

90.     Western Nevada Supply ("WNS") is a wholesale distributor that offers a diverse line of products including plumbing, water works, HVAC, PVF, Irrigation, and Hydronics & Solar. It has locations in Nevada and California.

91.     Approximately two years ago, WNS stocked NIBCO copper press fittings. Viega required WNS to drop NIBCO's copper press fittings and buy only Viega's copper press fittings before WNS could purchase carbon steel press fittings from Viega. As a result, WNS was forced to stop purchasing copper press fittings from NIBCO so that it could obtain Viega's carbon steel press fittings.

92.     Viega's conduct has suppressed competition for copper press fittings and allowed Viega to impose anti-competitive charges on end-users in these and all similarly situated distributor locations.

## IX.     INJURY TO COMPETITION

93.     Viega's anticompetitive practices, including tying, have restrained trade, and have preserved and entrenched Viega's market power. Viega's conduct has injured competition in the market for copper press fittings and has caused injury to wholesalers and end users in the form of above-competitive pricing.

94.     There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts. There is no legitimate business reason to prevent copper press fittings and carbon steel press fittings from being sold separately. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

95.     Viega's unlawful conduct and resulting injury to competition will continue unless injunctive and equitable relief is granted.

## X.     FEDERAL INJUNCTIVE CLASS

96.     Plaintiffs bring this action on behalf of themselves, and as a class, as defined below, under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2), seeking injunctive relief:

All United States indirect purchasers of copper press fittings manufactured by Viega LLC sold through Viega's wholesale distributors since January 29, 2015 ("Class Period").

A.    **Rule 23(a) Prerequisites**

97.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedures are met:

(a)    The number of persons in the Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)    There are numerous questions of law and fact arising from Viega's restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendant has engaged in a tying, restraint of trade or monopolization; and (2) whether this conduct, taken as a whole, has materially caused continuing and threatened antitrust price injury to be inflicted on indirect purchasers in the Class, as well as denial of free competitive choice.

98.    The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

99.    The Class Representatives and the Representatives' counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of each Class Representative and the members of the Class that would make

class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

### B.    Rule 23(b)(2) Prerequisites

100.    The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendant has acted,or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## XI.    STATE DAMAGES CLASSES

101.    Pursuant to this Court's supplemental jurisdiction, Plaintiffs and the proposed Class also seek damages under state antitrust statutes in 23 states and the District of Columbia, which accord a damage remedy to indirect purchasers of Viega copper press fittings suffering passed-on antitrust price injury due to Viega's unlawful conduct ("Indirect Purchaser Jurisdictions").

102.    These claims are prosecuted by Classes of indirect purchasers of Viega copper press fittings ("State Class") under Fed. R. Civ. P. 23(a) and 23(b)(3) and is defined as:

> All indirect purchasers of copper press fittings manufactured by Viega LLC and sold through its wholesale distributors located in the State Indirect Purchaser Jurisdictions from January 29, 2015 through judgment ("Class Period").

The classes are organized according to the Indirect-Purchaser Jurisdiction specified below.

### A.    Rule 23(a) Prerequisites

103.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedures are met:

> (a) The number of persons in the Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is

impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b) There are numerous questions of law and fact arising from Viega's restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendant has engaged in a tying, restraint of trade or monopolization; and (2) whether this conduct, taken as a whole, has materially caused continuing and threatened antitrust price injury to be inflicted on indirect purchasers in the Class, as well as denial of free competitive choice.

104.    The Class Representatives and the Representatives' counsel will fairly and adequately protect the interests of the members of each Class. There are no material conflicts between the claims of the Class Representatives and the members of each Class that would make class certification inappropriate. Counsel for each Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

### B.    Rule 23(b)(3) Prerequisites

105.    In addition, the prosecution of the claims of each Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)    Questions of law or fact common to the members of each Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

### FEDERAL INJUNCTIVE CLAIMS

**FIRST CLAIM FOR RELIEF**
**(TYING - SHERMAN ACT § 1 AND CLAYTON ACT § 3)**

106.    The allegations in paragraphs 1-105 are incorporated as if fully stated herein.

107.    Viega has engaged in an unlawful tying scheme in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

108.    Viega has tied the sale of its carbon steel press fittings (the tying product) to the purchase of it copper press fittings (the tied product) by (a) withholding its carbon steel press fittings altogether unless the wholesale distributor agrees to purchase Viega's copper press fittings, or (b) requiring wholesale distributors to pay higher prices for carbon steel press fittings if they purchase copper press fittings from anyone other than Viega, thus making a tied purchase the only viable option.

109.    Copper press fittings and carbon steel press fittings are separate and distinct products that are used for different applications and are not functionally interchangeable. The product characteristics, uses, and character of copper press fittings – which are used with copper pipes for potable, hot, chilled and process water applications for plumbing and HVAC systems – are different from the product characteristics, uses and the character of demand for carbon steel press fittings – which may be used with black iron pipes for fuel oil and fuel gas installations.

110.    At all times relevant to this action, Viega had market power in the market for the sale of carbon steel press fittings in the United States. Viega controls at least 95% of the carbon steel press fittings market. Moreover, there are high barriers to entry in the market for carbon steel press fittings, including both technological and regulatory barriers.

111.   Viega uses its market power in the carbon steel press fittings market to coerce wholesale distributors to purchase Viega's copper press fittings at above-competitive prices, and as a result these higher prices are then passed onto end users.

112.   Viega's conduct has stifled competition on the merits in the copper press fittings market.

113.   The amount of interstate commerce affected by Viega's tying scheme is substantial. In 2016, Viega's net sales of copper press fittings in the United States were approximately $115,000,000.

114.   Viega's conduct in conditioning the sale of its carbon steel press fittings on the purchase of its copper press fittings constitutes an illegal tying agreement and is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) or, in the alternative, is unlawful under the rule of reason, in that any purported pro-competitive justification for the tie is substantially outweighed by the anticompetitive effects in the copper press fittings market.

115.   There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

116.   If not enjoined, Viega will continue to engage in anticompetitive conduct that will further injure end users and competition.

117.   As a substantial, proximate and immediate result of Viega's anticompetitive and unlawful actions, Plaintiffs and members of the proposed Federal Indirect-Purchaser Injunctive

Class have been injured in their business or property, and continue to be threatened by such harm.

118.    Plaintiffs and members of the proposed Federal Indirect-Purchaser Injunctive Class seek an injunction prohibiting the Defendant's anticompetitive practices pursuant to Clayton Act § 16, 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF
### (RESTRAINT OF TRADE - SHERMAN ACT § 1)

119.    The allegations in paragraphs 1-118 are incorporated as if fully stated herein.

120.    At all times relevant to this action, Viega had market power in the market for the sale of copper press fittings in the United States. Viega controls approximately 71% of the copper press fittings market in the United States. Moreover, there are high barriers to entry in the market for copper press fittings, including both technological and regulatory barriers.

121.    Viega has forced wholesale distributors into agreements that prohibit them from purchasing copper press fittings from its competitors if they also want to purchase Viega's carbon steel press fittings.

122.    Viega's conduct constitutes an unlawful contract in restraint of trade or commerce in violation of Section 1 of the Sherman Act.

123.    The purpose and effect of the agreements was to diminish, eliminate, and exclude competition.

124.    Through its unlawful contracts, Viega has unlawfully injured competition by forcing wholesale distributors to pay above-competitive pricing and forcing end users to absorb the increased costs, and depriving end users and wholesale distributors of the freedom of choice.

125.    There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

126.    If not enjoined, Viega will continue to engage in anticompetitive conduct that threatens competitive injury to the business of property of members in the proposed Federal Indirect-Purchaser Injunctive Class.

127.    Plaintiffs and members of the proposed Federal Indirect-Purchaser Injunctive Class seek an injunction prohibiting the Defendant's anticompetitive practices.

### THIRD CLAIM FOR RELIEF
### (MONOPOLIZATION - SHERMAN ACT § 2)

128.    The allegations in paragraphs 1-127 are incorporated as if fully stated herein.

129.    At all times relevant to this action, Viega had monopoly power in the market for the sale of copper press fittings in the United States. Viega controls approximately 71% of the copper press fittings market in the United States. Moreover, there are high barriers to entry in the market for copper press fittings, including both technological and regulatory barriers.

130.    Viega has engaged in exclusionary conduct designed to prevent competition on the merits in the relevant market for copper press fittings, and thereby maintains and enhances its monopoly position in that market.

131.    Viega's anticompetitive conduct has decreased price competition in the copper press fittings market, deprived consumers of free choice, and imposed antitrust price injury on wholesale distributors and end user customers.

132.    There are no legitimate business or pro-competitive justifications for Viega's justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

133.    If not enjoined, Viega will continue to engage in anticompetitive conduct that will further injure wholesalers, end users, and competition.

**STATE DAMAGES CLAIMS**

**FOURTH CLAIM FOR RELIEF**
**(ALABAMA CODE §§ 6-5-60 ET SEQ.)**
**(ON BEHALF OF THE ALABAMA CLASS)**

134.    The allegations in paragraphs 1-133 are incorporated as if fully stated herein.

135.    By reason of the conduct alleged herein, Defendant has violated Alabama Code §§ 6-5-60 et seq.

136.    Title 6 of the Alabama Code regulates civil practice. Chapter 5 Article 5 thereof generally prohibits unlawful trusts, combines, or monopolies. Alabama Code §§ 6-5-60 et seq.

137.    Alabama Class members purchased copper press fittings within the State of Alabama during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

138.    Under Alabama law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in this Complaint. Alabama Code §§ 6-5-60 et seq.

139.    Defendant combined, contracted, understood and agreed in the market for copper press fittings in an unlawful manner, with the effect of restraining trade, increasing the price of copper press fittings and hindering competition in the sale of copper press fittings, in violation of Alabama Code §§ 6-5-60 et seq.

140.    Defendant monopolized or attempted to monopolize the production, control or sale of copper press fittings, in violation of Alabama Code §§ 6-5-60 et seq.

141.    Defendant's copper press fittings sold in stores throughout the State of Alabama. During the Class Period, Defendant's illegal conduct substantially affected Alabama commerce.

142.    Members of the Alabama Class were injured and are threatened with injury with respect to purchases of copper press fittings in Alabama in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief available under Alabama Code §§ 6-5-60 et seq.

**FIFTH CLAIM FOR RELIEF**
**(ARIZONA REV. STAT. §§ 44-1401 ET SEQ.)**
**(ON BEHALF OF THE ARIZONA CLASS)**

143.    The allegations in paragraphs 1-142 are incorporated as if fully stated herein.

144.    By reason of the conduct alleged herein, Defendant has violated Arizona Rev. Stat. § 44-1401, et seq.

145.    Arizona Class members purchased copper press fittings within the State of Arizona during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

146.    Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the copper press fittings market, a substantial part of which occurred within Arizona.

147.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the copper press fittings market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the copper press fittings market.

148.    Defendant's violations of Arizona law were flagrant.

149.    Defendant's unlawful conduct substantially affected Arizona's trade and commerce.

150.    As a direct and proximate result of Defendant's unlawful conduct, members of the Arizona Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct.

151.    By reason of the foregoing, members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Stat. § 44-1401, et seq.

## SIXTH CLAIM FOR RELIEF
### (CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 16720, 16750)
### (ON BEHALF OF THE CALIFORNIA CLASS)

152.    The allegations in paragraphs 1-151 are incorporated as if fully stated herein.

153.    By reason of the conduct alleged herein, Defendant has violated California Bus. & Prof. Code §§ 16700, *et seq.* and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.

154.    California Class members purchased copper press fittings within the State of California during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

155.    Defendant entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of California Bus. & Prof. Code §§ 16700, 16720, *et seq*. In order to maintain the price of copper press fittings at supracompetitive levels at the California Class's expense, Defendant has combined and conspired to restrain and exclude competition in the Relevant Market.

156.    Defendant's anticompetitive conduct was knowing and willful and constitutes a flagrant violation of Section §§ 16700, et seq.

157.    Defendant's exclusionary agreements with wholesalers prohibit or restrain end users from purchasing competitor products.

158.    There is no pro-competitive justification for this anticompetitive conduct that outweighs its anticompetitive effects. Any possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives.

159.    Defendant's anticompetitive conduct injured, and continues to injure members of the California Class in their business or property in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's anticompetitive conduct.

160.    Injury to members of the California Class was a direct, foreseeable, and proximate result of Defendant's anticompetitive conduct.

161.    As a result of Defendant's violation of Section 16700, *et seq.*, the California Class seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a).

**SEVENTH CLAIM FOR RELIEF**
**(DISTRICT OF COLUMBIA CODE ANN. §§ 28-4501 ET SEQ.)**
**(ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)**

162.    The allegations in paragraphs 1-161 are incorporated as if fully stated herein.

163.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

164.    District of Columbia Class members purchased copper press fittings within the District of Columbia during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

165.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the District of Columbia Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods...shall be deemed to be injured within the meaning of this chapter." D.C. Code 28-4509(a).

166.    Defendant contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for copper press fittings within the District of Columbia, in violation of D.C. Code § 28-4501, et seq.

167.    Members of the District of Columbia Class were injured and are threatened with further injury with respect to purchases of copper press fittings in the District of Columbia in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

### EIGHTH CLAIM FOR RELIEF
### (IOWA CODE §§ 553.1 ET SEQ.)
### (ON BEHALF OF THE IOWA CLASS)

168.    The allegations in paragraphs 1-167 are incorporated as if fully stated herein.

169.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

170.    Iowa Class members purchased copper press fittings within the State of Iowa during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

171.    Defendant contracted, combined or conspired to restrain or monopolize trade in the market for copper press fittings, and attempted to establish or did in fact establish a monopoly, a substantial part of which occurred in Iowa, for the purpose of excluding competition or controlling, fixing or maintaining prices for copper press fittings, in violation of Iowa Code § 553.1, et seq.

172.    Defendant's violations of Iowa law were willful or flagrant.

173.    Defendant's unlawful conduct substantially affected Iowa's trade and commerce.

174.    Members of the Iowa Class were injured and are threatened with further injury with respect to purchases of copper press fittings in Iowa in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## NINTH CLAIM FOR RELIEF
### (KANSAS STAT. ANN §§ 50-101 ET SEQ.)
### (ON BEHALF OF THE KANSAS CLASS)

175.    The allegations in paragraphs 1-174 are incorporated as if fully stated herein.

176.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

177.    Kansas Class members purchased copper press fittings within the State of Kansas during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

178.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Kan.Stat. Ann § 50-161(b).

179.    Defendant combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of copper press fittings, increasing the price of copper press fittings, preventing competition in the sale of copper press fittings, or binding themselves not to sell copper press fittings, in a manner that established the price of copper press fittings and precluded free and unrestricted competition among themselves in the sale of copper press fittings, in violation of Kan. Stat. Ann. § 50-101, et seq.

180.    Defendant's unlawful conduct substantially affected Kansas's trade and commerce.

181.    Members of the Kansas Class were injured and will continue to be injured with respect to purchases of copper press fittings in Kansas in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## TENTH CLAIM FOR RELIEF
### (MICHIGAN COMPILED LAWS ANN. §§ 445.771 ET SEQ.)
### (ON BEHALF OF THE MICHIGAN CLASS)

182.    The allegations in paragraphs 1-181 are incorporated as if fully stated herein.

183.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

184.    Michigan Class members purchased copper press fittings within the State of Michigan during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

185.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

186.    Defendant contracted, combined, or conspired, a substantial part of which occurred in Michigan, to restrain or monopolize trade or commerce in the market for copper press fittings, in violation of Mich. Comp. Laws § 445.772, et seq.

187.    Defendant's unlawful conduct substantially affected Michigan's trade and commerce.

188.    Members of the Michigan Class were injured and are threatened with injury with respect to purchases of copper press fittings in Michigan in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## ELEVENTH CLAIM FOR RELIEF
### (MINNESOTA ANN. STAT. §§ 325D.49 ET SEQ.)
### (ON BEHALF OF THE MINNESOTA CLASS)

189.    The allegations in paragraphs 1-188 are incorporated as if fully stated herein.

190.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination, or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

191.    Minnesota Class members purchased copper press fittings within the State of Minnesota during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

192.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56. Defendant contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for copper press fittings within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for copper press fittings within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for copper press fittings within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, et seq.

193.    Defendant's unlawful conduct substantially affected Minnesota's trade and commerce.

194.    As a direct and proximate result of Defendant's unlawful conduct, the members of the Minnesota Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct.

195.    By reason of the foregoing, the Minnesota Class is entitled to seek all forms of relief available under Minnesota Stat. §§ 325D.49, et seq.

## TWELFTH CLAIM FOR RELIEF
### (MISSISSIPPI CODE ANN. §§ 75-21-1 ET SEQ.)
### (ON BEHALF OF THE MISSISSIPPI CLASS)

196.    The allegations in paragraphs 1-195 are incorporated as if fully stated herein.

197.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

198.    Mississippi Class members purchased copper press fittings within the State of Mississippi during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

199.    Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

200.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9. Defendant combined, contracted, understood and agreed in the market for copper press fittings in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of copper press fittings and hindering competition in the sale of copper press fittings, in violation of Miss. Code Ann. § 75-21-1(a), et seq. 270.

201.    Defendant monopolized or attempted to monopolize the production, control or sale of copper press fittings, in violation of Miss. Code Ann. § 75-21-3, et seq.

202.    Defendant's copper press fittings sold in stores throughout the State of Mississippi. During the Class Period, Defendant's illegal conduct substantially affected Mississippi commerce.

203.    Members of the Mississippi Class were injured and are threatened with injury with respect to purchases of copper press fittings in Mississippi in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief available under Miss. Code Ann. § 75-21-21, et seq.

<div align="center">

**THIRTEENTH CLAIM FOR RELIEF**
**(NEBRASKA REV. STAT. §§ 59-801 ET SEQ.)**
**(ON BEHALF OF THE NEBRASKA CLASS)**

</div>

204.    The allegations in paragraphs 1-203 are incorporated as if fully stated herein.

205.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

206.    Nebraska Class members purchased copper press fittings within the State of Nebraska during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

207.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

208.    Defendant contracted, combined or conspired in restraint of trade or commerce of copper press fittings within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for copper press fittings within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through

agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, et seq.

209.    Defendant's unlawful conduct substantially affected Nebraska's trade and commerce.

210.    Members of the Nebraska Class were injured and will continue to be injured with respect to purchases of copper press fittings in Nebraska in that they paid and will pay supracompetitive prices for copper press fittings due to Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

<div align="center">

**FOURTEENTH CLAIM FOR RELIEF**
**(NEVADA REV. STAT. ANN. §§ 598A.010 ET SEQ.)**
**(ON BEHALF OF THE NEVADA CLASS)**

</div>

211.    The allegations in paragraphs 1-210 are incorporated as if fully stated herein.

212.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

213.    Nevada Class members purchased copper press fittings within the State of Nevada during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

214.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia,

price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

215.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

216.    Defendant fixed prices by agreeing to establish prices for copper press fittings in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted to monopolize trade or commerce of copper press fittings within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, et seq.

217.    Defendant's unlawful conduct substantially affected Nevada's trade and commerce.

218.    Members of the Nevada Class were injured and are threatened with injury with respect to purchases of copper press fittings in Nevada in that at least thousands of sales of Defendant's copper press fittings took place in Nevada, purchased by Nevada consumers at supracompetitive prices caused by Defendant's conduct.

219.    Accordingly, members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

### FIFTEENTH CLAIM FOR RELIEF
### (NEW HAMPSHIRE REV. STAT. §§ 356:1 ET SEQ.)
### (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

220.    The allegations in paragraphs 1-219 are incorporated as if fully stated herein.

221.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

222.    New Hampshire Class members purchased copper press fittings within the State of New Hampshire during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

223.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

224.    Defendant fixed, controlled or maintained prices for copper press fittings, allocated customers or markets for copper press fittings, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade, a substantial part of which occurred in New Hampshire, in violation of N.H. Rev. Stat. Ann. § 356:1, et seq.

225.    Members of the New Hampshire Class were injured and are threatened with injury with respect to purchases of copper press fittings in New Hampshire in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## SIXTEENTH CLAIM FOR RELIEF
### (NEW MEXICO STAT. ANN. §§ 57-1-1 ET SEQ.)
### (ON BEHALF OF THE NEW MEXICO CLASS)

226.    The allegations in paragraphs 1-225 are incorporated as if fully stated herein.

227.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

228.     New Mexico Class members purchased copper press fittings within the State of New Mexico during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

229.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

230.     Defendant contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for copper press fittings within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, et seq.

231.     Defendant's unlawful conduct substantially affected New Mexico's trade and commerce. Members of the New Mexico Class were injured and will continue to be injured with respect to purchases of copper press fittings in New Mexico in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## SEVENTEENTH CLAIM FOR RELIEF
### (THE DONNELLY ACT, NEW YORK GENERAL BUS. LAW §§ 340 ET SEQ.)
### (ON BEHALF OF THE NEW YORK CLASS)

232.     The allegations in paragraphs 1-231 are incorporated as if fully stated herein.

233.     Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

234.    Plaintiffs and New York Class members purchased copper press fittings within the State of New York during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

235.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

236.    Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of copper price fittings and restrained competition in the free exercise of the conduct of the business of copper price fittings within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, et seq.

237.    Defendant's unlawful conduct substantially affected New York's trade and commerce.

238.    Plaintiffs and members of the New York Class were injured and are threatened with further injury with respect to purchases of copper press fittings in New York in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## EIGHTEENTH CLAIM FOR RELIEF
### (NORTH CAROLINA GENERAL STAT. §§ 75-1 ET SEQ.)
### (ON BEHALF OF THE NORTH CAROLINA CLASS)

239.    The allegations in paragraphs 1-238 are incorporated as if fully stated herein.

240.    By reason of the conduct alleged herein, Defendant has violated N.C. Gen. Stat. § 75-1.1, et seq.

241.    North Carolina class members purchased copper press fittings within the State of North Carolina during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

242.    Defendant entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the copper press fittings market, a substantial part of which occurred within North Carolina.

243.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the copper press fittings market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

244.    Defendant's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

245.    Defendant's trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

246.    Defendant's conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the North Carolina class.

247.    Defendant's unlawful conduct substantially affected North Carolina's trade and commerce.

248.    As a direct and proximate result of Defendant's unlawful conduct, members of the North Carolina Class have been injured in their business or property and are threatened with further injury in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct.

249.    By reason of the foregoing, members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.

### NINETEENTH CLAIM FOR RELIEF
### (NORTH DAKOTA CENTURY CODE §§ 51-08.1-01 ET SEQ.)
### (ON BEHALF OF THE NORTH DAKOTA CLASS)

250.    The allegations in paragraphs 1-249 are incorporated as if fully stated herein.

251.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, et seq.

252.    North Dakota class members purchased copper press fittings within the State of North Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

253.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

254.    Defendant contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for copper press fittings, and established, maintained, or used a monopoly, or attempted to do so, a substantial part of which occurred within North Dakota, for the purposes of excluding competition or controlling, fixing or maintaining prices for copper press fittings, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

255.    Defendant's violations of North Dakota law were flagrant.

256.    Defendant's unlawful conduct substantially affected North Dakota's trade and commerce.

257.    Members of the North Dakota Class were injured and will continue to be injured for copper press fittings than they otherwise would in the absence of Defendant's unlawful

conduct, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

<div align="center">

**TWENTIETH CLAIM FOR RELIEF**
**(OREGON REVISED STATUTES §§ 646.705 ET SEQ.)**
**(ON BEHALF OF THE OREGON CLASS)**

</div>

258.    The allegations in paragraphs 1-257 are incorporated as if fully stated herein.

259.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

260.    Oregon Class members purchased copper press fittings within the State of Oregon during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

261.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

262.    Defendant contracted, combined, or conspired in restraint of trade or commerce of copper press fittings, and monopolized or attempted to monopolize the trade or commerce of copper press fittings, a substantial part of which occurred within Oregon, in violation of Or. Rev. Stat. § 646.705, et seq.

263.    Defendant's unlawful conduct substantially affected Oregon's trade and commerce. Members of the Oregon Class were injured with respect to purchases of copper press fittings within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, in that they paid more and

will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct.

264.    Members of the Oregon Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## TWENTY-FIRST CLAIM FOR RELIEF
### (RHODE ISLAND ANTITRUST ACT, RHODE ISLAND GEN. LAW §§ 6-36-1 ET SEQ.) (ON BEHALF OF THE RHODE ISLAND CLASS)

265.    The allegations in paragraphs 1-264 are incorporated as if fully stated herein.

266.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 6-36-2(a)(2).

267.    Rhode Island Class members purchased copper press fittings within the State of Rhode Island during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

268.    Under the Rhode Island Antitrust Act, as of July 15, 2013, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

269.    Defendant contracted, combined and conspired in restraint of trade of copper press fittings within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of copper press fittings for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, et seq.

270.    Members of the Rhode Island Class were injured and will continue to be injured with respect to purchases of copper press fittings in Rhode Island in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

### TWENTY-SECOND CLAIM FOR RELIEF
### (SOUTH DAKOTA CODIFIED LAWS §§ 37-1-3.1 ET SEQ.)
### (ON BEHALF OF THE SOUTH DAKOTA CLASS)

271.    The allegations in paragraphs 1-270 are incorporated as if fully stated herein.

272.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

273.    South Dakota Class members purchased copper press fittings within the State of South Dakota during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

274.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

275.    Defendant contracted, combined or conspired in restraint of trade or commerce of copper press fittings within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of copper press fittings within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, et seq.

276.    Defendant's unlawful conduct substantially affected South Dakota's trade and commerce.

277.    Members of the South Dakota Class were injured and will continue to be injured with respect to purchases of copper press fittings in South Dakota in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

### TWENTY-THIRD CLAIM FOR RELIEF
### (TENNESSEE CODE ANN. §§ 47-25-101 ET SEQ.)
### (ON BEHALF OF THE TENNESSEE CLASS)

278.    The allegations in paragraphs 1-277 are incorporated as if fully stated herein.

279.    By reason of the conduct alleged herein, Defendant has violated Tennessee Code Ann. §§ 47-25 101, et seq.

280.    Tennessee Class members purchased copper press fittings within the State of Tennessee during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

281.    Defendant has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations designed to, or which tend to, advance or control the price or the cost to end users in the copper press fittings market throughout Tennessee.

282.    Defendant's unlawful conduct affects Tennessee commerce to a substantial degree by causing Tennessee consumers to pay inflated prices for copper press fittings and has deprived Tennessee consumers of the ability to choose from high-quality, less expensive alternatives.

283.    As a direct and proximate cause of Defendant's unlawful conduct, members of the Tennessee Class have been injured in their business or property and are threatened with further

injury in that they paid more and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct.

284.    By reason of the foregoing, members of the Tennessee Class are entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, et seq.

<div style="text-align:center">

**TWENTY-FOURTH CLAIM FOR RELIEF**
**(UTAH CODE ANN. §§ 76-10-3101 ET SEQ.)**
**(ON BEHALF OF THE UTAH CLASS)**

</div>

285.    The allegations in paragraphs 1-284 are incorporated as if fully stated herein. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

286.    Utah Class members purchased copper press fittings within the State of Utah during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

287.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

288.    Defendant contracted, combined or conspired in restraint of trade or commerce of copper press fittings, and monopolized or attempted to monopolize trade or commerce of copper press fittings, in violation of Utah Code Ann. § 76-10-3101, et seq.

289.    Members of the Utah Class who are either Utah residents or Utah citizens were injured and will continue to be injured with respect to purchases of copper press fittings in Utah

would in the absence of Defendant's unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

<div align="center">

**TWENTY-FIFTH CLAIM FOR RELIEF**
**(VERMONT STAT. ANN. §§ 2453 ET SEQ.)**
**(ON BEHALF OF THE VERMONT CLASS)**

</div>

290.    The allegations in paragraphs 1-289 are incorporated as if fully stated herein.

291.    By reason of the conduct alleged herein, Defendant has violated the Vermont Statutes Annotated.

292.    Vermont Class members purchased copper press fittings within the State of Vermont during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

293.    Defendant coerced wholesalers into accepting Defendant's copper press fittings.

294.    Defendant has and had sufficient economic power in the copper press fittings market to coerce wholesalers' acceptance of Defendant's copper press fittings.

295.    Defendant's conduct has and had anticompetitive effects in the copper press fittings market, as supracompetitive prices for copper press fittings are passed on to end users.

296.    Defendant's unlawful conduct substantially affected Vermont's trade and commerce.

297.    As a direct and proximate result of Defendant's unlawful conduct, members of the Vermont Class have been injured in their business or property and are threatened with further injury in that they paid and will continue to pay more for copper press fittings than they otherwise would in the absence of Defendant's unlawful conduct.

298.     By reason of the foregoing, members of the Vermont Class are entitled to seek all forms of relief available under Vermont Stat. Ann. 9 § 2453 et seq.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**(WEST VIRGINIA CODE §§ 47-18-1 ET SEQ.)**
**(ON BEHALF OF THE WEST VIRGINIA CLASS)**

299.     The allegations in paragraphs 1-298 are incorporated as if fully stated herein.

300.     The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

301.     West Virginia Class members purchased copper press fittings within the State of West Virginia during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

302.     During the Class Period, Defendant engaged in a continuing contract, combination or conspiracy, a substantial part of which occurred in West Virginia, with wholesalers in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, et seq.

303.     Defendant's anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

304.     Defendant's unlawful conduct substantially affected West Virginia's trade and commerce.

305.     As a direct and proximate result of Defendant's unlawful conduct, members of the West Virginia Class have been injured in their business and property in that they paid more for copper press fittings than they otherwise would have paid in the absence of Defendant's unlawful conduct.

306.     As a result of Defendant's violation of Section 47-18-3 of the West Virginia Antitrust Act, members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

## TWENTY-SEVENTH CLAIM FOR RELIEF
### (WISCONSIN STAT. §§ 133.01 ET SEQ.)
### (ON BEHALF OF THE WISCONSIN CLASS)

307.     The allegations in paragraphs 1-306 are incorporated as if fully stated herein.

308.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01. 355.

309.     Wisconsin Class members purchased copper press fittings within the State of Wisconsin during the Class Period. But for Defendant's conduct set forth herein, the price of copper press fittings would have been lower.

310.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

311.     Defendant contracted, combined or conspired in restraint of trade or commerce of copper press fittings, and monopolized or attempted to monopolize the trade or commerce of copper press fittings, a substantial part of which occurred within Wisconsin, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, et seq.

312.     Members of the Wisconsin Class were injured with respect to purchases of copper press fittings in Wisconsin in that the actions alleged herein substantially affected the people of

Wisconsin, with consumers in Wisconsin paying substantially higher prices for Defendant's copper press fittings in Wisconsin.

313.    Accordingly, members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as a member of the proposed Federal Indirect-Purchaser Injunctive Class and the State Class pray that:

A.    This Court find that Defendant's conduct constitutes violations of the Sherman Act, 15 U.S.C. §§ 1, 2 and the Clayton Act, 15 U.S.C. § 14;

B.    This Court award injunctive relief to the proposed injunctive Class under Section 16 of the Clayton Act, 15 U.S.C. § 26, and award damage relief to the proposed damage Class in the Indirect-Purchaser Jurisdictions pursuant to its supplemental jurisdiction;

C.    Plaintiffs recover reasonable attorneys' fees and costs as allowed by law;

D.    Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.    Plaintiffs be granted such other and further relief as the Court deems just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED: May 13, 2019

<div style="margin-left:40%">

/s/ Walter W. Cohen, Esquire
Walter W. Cohen
PA Bar No. 12097
Nicholas R. Jimenez
PA Bar No. 321144
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
200 Locust Street Suite 400
Harrisburg, PA  17101-1508
T: (717) 221-7920
F: (717) 326-2485
walter.cohen@obermayer.com
nicholas.jimenez@obermayer.com

Heidi Silton
Elizabeth Odette
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
hmsilton@locklaw.com
erodette@locklaw.com

Nathan D. Prosser
Anne T. Regan
Carol R.M. Moss
HELLMUTH & JOHNSON PLLC
8050 West 78th Street,
Minneapolis, MN 55439
T: (952) 941-4005
F: (952) 941-2337
aregan@hjlawfirm.com
nprosser@hjlawfirm.com
cmoss@hjlawfirm.com

</div>